JOHN N. RICHARDS, executor, &c. *vs.* GEORGE O. WARRING and others.

Where, after two persons had signed a promissory note, not negotiable, a third person wrote his name across the back, and it was thereupon transferred to the payee, who parted with the full consideration mentioned in it upon the credit of the note, the note having been in fact·made to obtain such consideration; *Held* that the person· so writing his name üpon the back of the note was not an indorser, nor a guarantor, but was a joint promissor with the other signers; and that the precise locality of his signature, upon the note, was immaterial.

The code of procedure has not abrogated the distinction that existed in the law merchant, between nogotiable and non-negotiable paper.

THIS was an action brought by the plaintiff as executor of Platt Richards, deceased, upon a promissory note, of which the following is a copy:

"$820.    One year after date we promise to pay Platt Richards, eight hundred and twenty dollars, with interest, value received.    Amsterdam, April 1st, 1857.

    (Signed)    JAMES E. WARRING.
        JAMES B. CHAPMAN."

And written across the back, "George O. Warring."

This note was given for $820, loaned by the plaintiff's testator, to James E. Warring and James B. Chapman, composing the firm of "Warring & Chapman." When delivered by them to the payee the note was executed, in the form it now appears, by all the persons whose names are upon it, and the money was paid by the payee to the firm of "Chapman and Warring," at the time the former received the note. The loan was made upon the credit of the note. Richards, the payee, died January 20th, 1860, and the plaintiff is his sole executor, duly authorized, by letters dated 5th April, 1860.    The cause was tried before a referee.

"Chapman & Warring," the signers upon the face of the note, made no defense on the trial. The defendant "George O. Warring," set up in his defense that he was an *indorser* only, and insisted that he could be made liable in no other

Richards *v.* Warring.

character. It was admitted that he had no part of the money, nor any benefit therefrom, and that ṇo steps were taken to charge him as an indorser. The due execution of the note by all the parties defendant was admitted. The defendant George O. Warring, on the trial, called as a witness his co-defendant, James E. Warring, who testified "that before delivering this note, and obtaining the money thereon, he presented to George O. Warring a note, similar to this, payable on demand,· and asked him to indorse it, which he refused to do, but said he would indorse it if made payable one year after date. "I then made this note and he indorsed it as it is."

The referee reported in favor of the plaintiff, and from the judgment entered on the report the defendant George O. Warring appealed.

*J. Pulver Heath*, for the appellant.

*J. M. Carroll*, for the plaintiff.

*By the Court,* POTTER, J. If the code of procedure has not abrogated or interfered with what is commonly known as the commercial law, or law merchant, as it has been understood in this country, the question to be decided is, strictly and only, a question of law. Assuming, for the present, that the "law merchant" remains unchanged; what then is the *legal effect* to one who writes his name, without any thing more, upon the back of a promissory note *not negotiable,* which is thereupon transferred to the payee named in the note, and who at the time of the delivery thereof to him parts with the full consideration mentioned in it, upon the credit of the note? That, I think, is this case fairly stated. It seems to me the law itself in such case determines the character and effect of the contract as between the parties, and that we may therefore start with the legal presumption that each of the parties equally well understood what liability

the law has so fixed to the several signatures, and that each, in so making the contract, was content to leave and did leave the contract to be interpreted and the effect declared by the law of the land. Lord Bacon, in his Maxim, Regula 3, that "words are to be taken most strongly against him who uses them," says: "It is a rule drawn out of the depth of reason; for, first, it is a schoolmaster of wisdom and diligence in making men watchful in their own business; next, it is the author of much quiet and certainty, and that of two sorts, first, because it favoreth acts and conveyances executed, taking them still beneficially for the grantees and possessors, and secondly, because it makes an end of many questions and doubts about construction of words; for if the labor were only to pick out the *intention* of the parties, every judge would have a several sense; whereas this rule doth give them a sway to take the law more certainly one way." (*Id. Max.* 18, *in Reg.* 3.) "Words ought to be understood so as to have some operation." (*Fox's case,* 8 *Co.* 94.) In attempting to interpret this instrument from its *words,* I shall therefore hold, as is insisted on the argument by both parties, that this contract must speak for itself by its own language, and that the intent of the parties to the note cannot be changed or established by parol.

Each signer of the note, then, is presumed to have known that the object of having his name appear upon it, was to give strength and responsibility to the paper for the purpose of obtaining the desired credit. This presumption is confirmed by the circumstances attending its inception, for though parol evidence may not be admitted to alter or contradict a written instrument, evidence of extrinsic circumstances may be given in *aid* of a construction consistent with, or in support of the terms of the contract. So evidence of the consideration of a note between the parties to it, and of the purpose for which it was made. (3 *Kern.* 559. 1 *Barb. S. C. Rep.* 635. 3 *id.* 79. 18 *N. Y. Rep.* 367.)

It is admitted that upon the credit of the paper so exe-

cuted and delivered to the payee, the money was actually advanced. While there has been a long and somewhat doubtful conflict going on in the courts in regard to the liability of indorsers in blank, in certain cases upon *negotiable* paper, there has been little or none that I am aware of in regard to the effect of signatures to paper *not negotiable*. The distinction between these two kinds of paper has not, I think, been confounded; and it seems to be principally for the reason that by the law merchant the term *"indorsement"* is not a proper legal term to apply to the act of one who adds his name in any manner to the latter kind of note.

The proper definition of "indorsement" or "endorsement," in the commercial sense, is "the writing of one's name upon or across the back of a bill of exchange, promissory note or check, by which the property is assigned or transferred." Literally, "to write on the back," but in practice the plan of writing is not essential, it is a good indorsement if made upon the face, (*Story on Notes*, § 121,) or even on a separate piece of paper. (*Chitty on Bills*, 141.) This effect, that is, a transfer, is not wrought upon a note *not negotiable*, by a signature across the back of it. The title, or property, does not pass by merely writing the name thus upon it. It is not, therefore, properly and legally an "indorsement," when applied to the latter kind of paper. The note is not thereby transferred. (*Per Bockee, senator, in Hall* v. *Newcomb,* 7 *Hill,* 422. *Burrill's Law Dic. title "Indorser."*)

Not being such an indorser as to pass the title, it is clear, that strictly by the law merchant, the defendant is not liable as such. But did not the defendant, therefore, make any contract with the payee by so affixing his name to the note? Though it is not negotiable, the instrument is still by the law merchant a promissory note, which is defined to be "a written engagement by one person to pay another person therein named absolutely and unconditionally a certain sum of money at a time specified therein." Story on Promissory Notes, § 1, defines, and our statute declares, (1 *R. S.* 768,)

that "all notes in writing and *signed by any person* whereby he shall promise to pay to any other person or his order, or to the order of any other person, or unto the bearer, any sum of money therein mentioned, shall be due and payable as therein expressed, and shall have the same effect and be negotiable in like manner as inland bills of exchange *according to the custom of merchants.*" The custom of merchants, as to the effect of the contract and of its negotiability, is here expressly recognized by statute. Did the defendant then, in presumption of law, intend to bind himself in some manner by so adding his name? I think he did, and it only remains to say in what character the law declares that intent to have been made. It is insisted and with great force that he *intended* only to bind himself as indorser, and not otherwise, and that the court cannot make another contract for him. It is clear that he put his name on the note knowing that the money was to be obtained on the note from Richards. It is equally clear that he knew his name was wanted to give credit to the note to Richards. He could not have believed that he was becoming only the security for Richards, and not security to him. What was the use of security to Richards? He was lending money on the strength of the paper. How would Richards be benefited or the defendant liable if he, Richards, was to be first liable? Reason excludes the idea that he only intended to indorse and become liable after Richards, the lender. Neither of the parties intended to make such a contract. He must therefore have known that by signing his name upon the back of a note not negotiable he was *not* becoming an indorser. The legal presumption as to his *intent* is that he did not intend to sign it as indorser. I concede the law to be, as urged, that the court are not authorized to spell out or write out another contract for him that he did not himself make. But still the fact remains that he put his name to the note. The law then steps in and declares that he put it there for some purpose. It is fair then to presume that he *intended* it to stand there in some

Richards *v.* Warring.

*legal* form of security to the payee in the note for the money that he (the payee) was to advance upon it. The maker as well as the indorser of a note always warrants the legality of the contract. (*Bayley on Bills, Sewell & Philips'* 2d ed. 149. *Burrill* v. *Smith,* 7 *Pick.* 294. *Edw. on Bills,* 289. *McKnight* v. *Wheeler,* 6 *Hill,* 493.) Now, as there seems to be no other parties in law to such a note, but *guarantor* and *maker,* he must have intended to become security, in one of these forms of "guarantor" or "maker."

If the legal presumptions are as we have said, then he must of necessity have signed the note to the payee, in one of these relations. This relation, I am equally clear, cannot be that of a "*guarantor;*" unless we revive the exploded doctrine that the party payee, or owner, is authorized to write a guaranty over the blank signature of the party attempted to be charged. Such a doctrine is not now in favor with the courts; it is denied by counsel here in this case to be the law. It could not be often available to a party unless it be carried to such an extent as to repeal the statute of frauds by judicial construction, or more properly by judicial legislation.

If it shall be held that the party possesses the power to write a guaranty over a signature, he should be held also to have the right to express the consideration therein; otherwise the statute would defeat his contract, when it is so written; or he must be permitted to prove a consideration by parol evidence, thus carrying the power of making the new agreement to such an extent as to mean something else than what upon its face it purports to mean. This is a doctrine fraught with such dangers and difficulties, is attended with such confusion in practice, such uncertainty in its limit, and opens a door to mischief so wide, that the modern cases have substantially overruled the whole of it. (*Brewster* v. *Silence,* 4 *Seld.* 207, 214. *Hall* v. *Newcomb,* 7 *Hill,* 416. *Brown* v. *Curtis,* 2 *Comst.* 225.)

It seems to me, therefore, that the defendant George O. Warring is not liable as "*guarantor;*" that this is not the

legal. character he assumes by thus putting his name upon the paper. If he was so, the pleadings could be amended, to conform them to the case proved. (2 *Seld.* 19.) Having then put his. name to this note before its delivery to the payee, in order to become liable for the money advanced by him in such character as the law shall declare to be his liability, the remaining inquiry upon this branch of the case still is, what is the character of his liability? Is it not that of maker? If it is not, then most surely he is not liable at all. In *Hall* v. *Newcomb,* (3 *Hill,* 235,) Cowen, J. speaking of one who puts his name upon the back of a note not negotiable, says, "·there is *no possibility* of raising the ordinary obligation of *indorser,*" but in such cases (he says) "there is then room to *infer* that a *different* obligation was *intended;*" "the question depends entirely on the fact of negotiability." In *Seabury* v. *Hungerford,* (2 *Hill,* 84,) there is a dictum by the same judge, to the same effect; and he adds, "when the contract cannot be enforced in the particular mode contemplated by the parties, the *courts,* rather than suffer the agreement to fail altogether, will give it effect some other way."

Perhaps one of the strongest cases in the books against the defendant, is *Moies* v. *Bird,* (11 *Mass. R.* 436.) One Benjamin Bird was indebted to Moies, the plaintiff, for the part consideration of a farm, and gave him a note payable to his (plaintiff's) order, and the plaintiff and drawer of the note, (Benjamin Bird) then applied to two brothers of the latter, Wm. and Abm. Bird, to indorse the note. Wm. Bird refused, and Abm. said, "it was not a negotiable note, and he would write his name to make the plaintiff easy, but would . not be accountable for a farthing on the note." The argument of Ch. J. Parker, in that case, accords with my views as here expressed. He said, "It is manifest that the defendant intended to make himself liable in some form; at least *such is the intent to be presumed* even against his declaration at the time of signing." "Had the note been made payable

Richards *v.* Warring.

to him, and *negotiable* in its form, the plaintiff would have been restricted to such an engagement. In such case the defendant would have been held as *indorser*, and in no other form, for such must be presumed to have been the intent of the parties to the instrument. But this note was not payable to the defendant, *and therefore was not negotiable* by his indorsement." "What then was the effect of his signature ? It was to make him absolutely liable to pay the contents of the note," &c. (*See also Sumner* v. *Gay*, 4 *Pick.* 311; 24 *id.* 64; 13 *Metc.* 205. *Griswold* v. *Slocum*, 10 *Barb.* 402. *Story on Prom. Notes*, § 473, *and cases cited in note* 1. *Dean* v. *Hall*, 17 *Wend.* 214. *Bryant* v. *Eastman*, 7 *Cush.* 113, *per Shaw, Ch. J. Edw. on Bills*, 230.) The case of *Palmer* v. *Grant*, (4 *Con. Rep.* 389,) was upon a note drawn in these words : " Six months from date, we, Grant & Wattles, as principals, and Daniel Carr and William Grant surety, promise to pay Cyrus Palmer or order, sixty-two dollars with interest, value rec'd.

(Signed) GRANT & WATTLES."

On the back of the note, was written in the usual manner of indorsement : "DANIEL CARR.

WILLIAM GRANT."

It was held that Daniel Carr and William Grant, though signing in the form of indorsers, and the contract expressing that they were surety, were liable, *not* as guarantors merely, but as joint promissors with Grant & Wattles. In this state, we have the case of *Griswold* v. *Slocum*, (10 *Barb.* 402,) and the case of *Lake* v. *McVean*, (*MS. opinion*,) decided in this 4th district, at general term, per Rosekrans, J. to the same effect. "If one before the delivery of a promissory note not negotiable, subscribes his name to it without explanation, whether upon the face or back of the note, and the note be then delivered to one who upon the credit of the note advances his money upon it, he who so subscribes becomes liable to pay the note absolutely." (*Chitty on Bills*, 177.) In the case of *Gibson* v. *Minot*, (1 *H. Black.* 585,) Hotham,

Baron, said, (speaking of the parties to a bill of exchange payable to a fictitious person,) " If they accepted a bill which they knew was so framed as to be incapable of being proved in the shape it bore; they shall nevertheless be held to their undertaking to pay it, though it be presented to them in another; because they themselves have induced such necessity, for it is a known rule of law, that no man shall take advantage of his own wrong." Perrin, Baron, in the same case, said, " Every person whose real name and signature appears on a bill of exchange, is responsible to the extent of the *credit* he gives to it in the negotiation of it." Our statute has adopted this principle. Notes payable to fictitious persons, are to be regarded as payable to bearer.

Such, as I understand it, is the law merchant; and such holding covers this case, and what is better, as seems to me, it is the good sense construction based upon a principle that the title is immediate, and that the contract appears from the terms of the instrument itself; that but two parties are named, the promissors and the promisee. The drawers chose to give the form they did to the instrument to secure a credit. The defendant George O. Warring accepted the form of the promise, and Richards parted with his money upon the credit of it. If the defendant is to be held to stand in any other character than that of drawer or joint promissor, it must be a character to be presumed against the express language of the contract he has signed. The rule is, that every expression in a contract is to be so construed, as to give it effect if possible. (*Chit. on Cont.* 70. 4 *Seld.* 446.) And " presumptions to *sustain* an instrument are to be favored — presumptions to destroy it, never."

I have no doubt these views of the law can be maintained as being the inherent principle, " *ipso jure,*" of the contract between the parties; to which we may add, that *the law presumes the defendant promised in a legal form.* This is more sensible than a resort to any legal fiction, or to the principle, that such a holding can only be sustained in order to

prevent an entire failure of justice, or to the maxim *ut res magis valeat quam pereat;*" though this maxim is also adopted as applicable, in *Hall* v. *Newcomb*, (*supra.*)

This note is the very simplest form of a contract that can be devised ; the defendant George O. Warring puts his name to it as a contract, written in words, " We promise to pay," &c.; his name is given as security for money to be loaned before the money is parted with; the note is then delivered to the payee, and the money paid upon the strength of the contract. The law prescribes no place in particular upon the note, for the signature. It is good if written anywhere upon it with intent to be held liable. Though it is quite usual, that the makers sign notes at the bottom, they are good if signed elsewhere. (*Taylor* v. *Dobbins*, 1 *Strange*, 399, 18.) So it is usual to *indorse* notes by writing the name on the *back*, yet it has been held that an indorsement on the *face* was good. (*Edw. on Bills*, 267. *Saunderson* v. *Jackson*, 3 *Esp.* 180. *Venight* v. *Crockford*, 1 *id.* 190.) In this way no violence is done to sense : the law enforces what must be presumed to be the intent, the payment of the money to the person justly entitled.

There is another point strongly urged by the defendant's counsel which is new, and I feel bound therefore to give it a moment's consideration, viz: that the only *reason* for the distinction which has heretofore existed in the law between notes *negotiable* and those *not negotiable*, has been swept away by the provisions of the code, and does not now exist; that the supposed reason was, that non-negotiable paper must always be sued in the name of the payee; that by the code, the actual owner of paper may now sue in his own name; (*Code*, § 111;) and, that the distinction having no ground of principle now to stand upon, ceases to be the law.

It is impossible, at this day, to say with certainty what were the reasons; whether that assigned was one, or whether other reasons did not exist for the distinction, which is found in the law, between these two kinds of notes, negotiable and

non-negotiable. The commercial law, which included the customs in regard to bills of exchange, was introduced into England in the times of Anglo Saxons, but had a disputed and a much earlier origin. (3 *Kent*, 10.) It was perfected from time to time as commerce increased, until it became a distinct code or body of rules, called "the law or custom of merchants," "*Lex mercatoria*," and was adopted almost universally by all the European countries, as the law relative to commerce. It was not peculiar alone to England, but became common to all nations in commercial intercourse with them, and especially in regard to the drawing, acceptance and transfer of inland bills of exchange. That part of this law which relates to bills of exchange was not introduced into common use in England until the close of the reign of Charles second. In *Bulles* v. *Crisp*, (*reported in* 6 *Mod.* 29,) Lord Holt said, "I remember when actions upon *inland* bills of exchange did first begin; and then they laid a *particular custom* between London and Bristol, and it was an action against an acceptor. The defendant's counsel would put them to *prove the custom*, at which Hale, chief justice, laughed, and said ' they *had a hopeful case of it.*' "

Lord Holt, down to that period, which was the second year of Queen Anne's reign, denied the negotiability of *promissory notes*, and in that case it was proved that promissory notes had been then in use about thirty years. But even in England, the *distinction* between bills of exchange and promissory notes existed, until it was found necessary to put them upon an equal footing by an act of parliament, 3 and 4 Ann, ch. 9. This act of parliament was substantially copied in the laws of this state, 27th of March, 1794, (*Green. ed. of N. Y. Statutes, vol.* 3, *p.* 140,) thereby adopting "the custom of merchants" as applicable to promissory notes.

This custom was also adopted as common law into most of the other states of the Union, with the great body of the English common law, substantially as it existed in England, and except in so far as the peculiarities of our condition have

Richards *v.* Warring.

demanded it, the legislature of this state and the courts have made no material changes in this body of law.

It requires no argument to prove that it ought to be as uniform as it is universal, and that every variation or *special* "lex loci" of this law of commerce, would inflict innumerable evils, and create serious embarrassments in all transactions affected by such change. I am not able to say from its uncertain origin, equally uncertain history, and more uncertain letter, that there may not be other *good reasons* than that named for the distinction 'referred to, and should not therefore feel justified without far greater research than I have been able to give it, to strike so radical a blow by construction at this feature of a law so common to all civilized commercial nations, as that now insisted on. By the law merchant, every transfer of a bill, whether by delivery when payable to bearer, by indorsement when payable to order, or otherwise, was called an *assignment.*

In *Gibson* v. *Minot, (supra,)* Lord Chief Baron Eyre said, " It is by force of the custom of merchants, that a bill of exchange is assignable at all. Of necessity, the custom must *direct how* it shall be assigned." In speaking of the usefulness of bills of exchange as perfected by the law merchant, he says : " The wit of man cannot devise any thing better calculated for circulation. The value of the writing, the assignable quality of it, and the particular mode of assigning it, are created, and determined in the original frame and constitution of the instrument itself, and the party to whom such a bill is tendered, has only to read it, need look no further, and has nothing to do with any private history that may belong to it. The policy which introduced this simple instrument demands that the *simplicity* of it should be protected." It was held in that case, that a note payable to a fictitious person which came to a bona fide holder, and which of course could not be indorsed on account of the fictitious payee, might be treated by the holder as against the real signers, as if it was made payable to bearer.

Nor am I able to hold that it was the *effect*, much less the *intention* of the provisions of the code, to abrogate, change, or in degree to modify this almost uniform body of commercial law so in use in nearly all commercial states and countries with whom we hold intercourse, repeal the statute which has adopted the custom, and to make new and special provisions in it, *peculiar* to this state. The intent of the code of procedure, so far as the intent can be judged of from the title, was only " to simplify and abridge the practice, pleadings and proceedings of the courts of this state." There is certainly no such intent expressed, and neither the statute nor the common law are to be deemed abrogated, except by express statute enactment, or by necessary implication. By force of a maxim frequently applied in construction of statutes, " *expressio unius, est exclusio alterius,*" the construction contended for would be *excluded*. The idea advanced is new, and extremely radical in effect. To simplify a system of practice, is entirely consistent with continuing in force all the established principles of the law itself that control the ordinary relations of business or commerce. The recital which precedes the code, equally with the title, *excludes* the idea that it was intended to overturn or unsettle a single principle of law, or any right of the citizen hitherto regarded as well defined by elementary writers and by a long series of common law adjudications. It would have created a deeper interest in the public mind, had it been understood that such a result could be wrought out of its letter or spirit; on the contrary, it seemed to me to *limit* its claim of change by saying : " Whereas it is expedient that the present *forms* of actions and pleadings, in cases at common law, should be abolished, and that the *distinction* between legal and equitable *remedies* should no longer continue, and that a uniform course of proceedings in all cases should be established ; therefore," &c. It was not urged on the argument that it was the *intent* of the legislature to work a change in this branch of the law of the land, or of any other ; but that it was the necessary *effect*

Richards *v.* Warring.

of this provision by reason of the established maxim: " The reason of the law ceasing, the law itself ceases." I have attempted to show that by *excluding* all such *intent*, no such *effect* could follow; certainly not in a case when the reason for the existence of the law is not traced to a certainty, or limited to one single reason.

Upon the whole, I have come to the conclusion, that by the law of this case, George O. Warring was not an indorser; tha the was not a guarantor, but was a joint promissor with the other defendants; and that the precise locality of his signature upon the note was immaterial. This construction makes it a plain, simple and intelligible contract, easily understood, has the basis of good sense to support it, and needs no strained construction nor aids of fiction to sustain it. What else was the end and object of the defendant's signature but a liability to pay in some form the sum promised? If there be a slight informality in the execution of the contract, he is not allowed to come into court and set up his own informality as a defense. The law will conclude he intended to waive this informality. Such a conclusion it appears to me is most conformable to the principles of natural justice, and establishes a policy that ought to operate on all commercial transactions. Bargains should be enforced, undertakings executed, and promises to pay performed; and the rule, that a man's own acts shall be taken most strongly against himself, applies with all its force in favor of the party who in confidence of its integrity has parted with his money upon the strength of it. " *Ratio legis, est anima legis.*" The plaintiff was therefore, I think, entitled to judgment for the amount of the note, and the judgment should be affirmed.

[SCHENECTADY GENERAL TERM, January 6, 1863. *Rosekrans, Potter, Bockes* and *James,* Justices.]